GREATER PACIFIC LAW OFFICE, LLLC

DAVID R. SQUERI        8714
1003 Bishop Street, Suite 1410
Honolulu Hawaii, 96813
Telephone:  (808) 426-7918
Facsimile:   (808) 435-3001
Email:        squeri@greaterpacificlaw.com

Attorney for Plaintiff
SHARON CARTER

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SHARON CARTER,<br><br>        Plaintiff,<br><br>    v.<br><br>UTTAM DHILLON, Acting<br>Administrator, United States Drug<br>Enforcement Administration,<br>U.S. Department of Justice,<br><br>        Defendant. | Civil No.  _____<br><br>COMPLAINT; DEMAND FOR JURY<br>TRIAL; EXHIBIT "A" |

## **COMPLAINT**

Sharon Carter, by and through undersigned counsel, makes the following

complaint under Title VII, 42 U.S.C. § 2000e et seq., for discrimination based on

gender, and retaliation for her protected EEO activity; as well as under the

1

Rehabilitation Act, 42 U.S.C. § 12101, et seq. Plaintiff demands a trial by jury on

all issues so triable.

## PARTIES

1. Plaintiff, Sharon Carter, is a former employee of the U.S. Drug

Enforcement Administration ("DEA").

2. Defendant is the Acting Administrator of the DEA, named in his official

capacity pursuant to 42 U.S.C. § 2000e-16.

3. Defendant is properly named as the head of the Agency pursuant to 42

U.S.C. § 2000e-16(c).

## JURISDICTION AND EXHAUSTION

4. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and

28 U.S.C. § 1343.

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

6. Plaintiff satisfied the administrative prerequisites for filing suit by

contacting an EEO counselor within the required time limits.

7. Plaintiff filed a formal complaint of discrimination on October 28, 2016,

against the Defendant based on reprisal, disability, and gender discrimination.

8. Plaintiff's formal complaint listed a continuing line of harassment

incidents starting in December 2015.

9. After 180 days had passed since the filing of Plaintiff's formal EEO Administrative Complaint, on September 5, 2018, Plaintiff filed a Notice of Hearing Withdrawal with the EEOC Administrative Judge, demanding the Agency complete a Final Agency Decision.

10. Since that time as about three months have passed, the Agency has failed to issue a Final Agency Decision.

11. The Agency is required to issue the final decision within 60 days of receiving notification that a complainant has requested an immediate decision from the Agency. 29 C.F.R. § 1614.110(b).

12. The Agency failed to issue a Final Agency Decision in accordance with the aforesaid regulation.

13. Plaintiff has satisfied all administrative requirements and exhausted her administrative remedies before bringing this claim.

14. This action also arises under the Rehabilitation Act, 42 U.S.C. § 12101, *et seq*., which prohibits discrimination against disabled employees.

15. Defendant does business at the Drug Enforcement Administration, 75 Morrissette Drive, Springfield, VA 22152.

16. All of the necessary administrative prerequisites have been met prior to filing the instant action, as Plaintiff has filed timely complaints of discrimination

and retaliation with her federal employer and more than 180 days have passed since the filing.

17. Defendant resides in this judicial district, and a substantial part of the events giving rise to this action took place within this judicial jurisdiction.

18. Therefore, this court also has jurisdiction over these claims under the aforementioned statutory law.

## FACTS

19. Plaintiff Carter is a female that suffers from major depressive disorder, post-traumatic stress disorder and military sexual trauma, and generalized anxiety disorder.

20. Carter has been on depression medication since 1994, and anxiety medication a few years later.

21. Carter was in the U.S. Marine Corps for ten years.

22. Carter has been a DEA agent for over eight years.

23. From May 1991 to June 1999, Carter was a DEA Special Agent.

24. From 1997 to July 12, 1999, Carter was the Public Information Officer for the Los Angeles, CA office.

25. From January 2004 to July 2006, Carter worked for the State Department, as the Acting Regional Security Officer and Acting Administrative Officer for the Consulate General in Chiang Mai, Thailand.

26. From July 2006 to May 2010, Carter worked as a contract Federal Background Investigator for four federal agencies in Tucson, AZ.

27. In June 2010, Carter returned to the DEA in Tucson, AZ, as an Intelligence Analyst ("IA").

28. From August 2012 to December 2015, Carter worked in the DEA Special Operation Division (SOD) in Northern Virginia.

29. Carter was hired for a DEA GS-13 IA position in Hawaii beginning December 23, 2015.

30. Carter's medical disability was never a problem at work until she began working at the Hawaii office.

31. Carter's supervisor in the Hawaii field office was an individual named Robert Melesciuc.

**Melesciuc Restricted Carter's Ability to Do Her Job Properly**

32. Ms. Carter's first day of work in the Hawaii field office was December 23, 2015.

33. From her first day on December 23, 2015 through February 28, 2016, Melesciuc gave Carter almost no work to do.

34. Carter collected intelligence for the Agents, and Melesciuc admonished her for working on cases, telling her that she was forbidden from passing intelligence to the IA's assigned to the cases and to the Agents.

35. On or about January 15, 2016, after Carter asked Melesciuc for work several times, he left a paper on her desk with names and phone numbers of targets, stating "go ahead and play with this while you're waiting for your own case."

36. On or about January 27, 2016, Melesciuc told Carter to accompany him to a debriefing with GS Brian Bonifant, three of his Agents, and IA Eduardo Gomez; but forbade Carter from talking to them at all about their case.

37. At said meeting, it became clear that the meeting was regarding the list of names and phone numbers that Carter had been given two weeks before, but since Carter was forbidden from speaking, she could not tell them who their target was and how they were all related.

38. After said meeting, Carter passed the intel on to Bonifant and his agents, with the understanding that they "developed the intel on their own", because she could not write a report since she was not supposed to help them.

39. On or about February 18, 2016, Carter met with Melesciuc and again requested her own case or to be allowed to initiate her own case; she was again told to wait.

40. On February 19, 2016, Melesciuc assigned Carter a low priority, irrelevant case to work on.

41. From February 28, 2016, to July 2016, Carter was assigned secondary case work while male employees were assigned primary cases.

42. Melesciuc restricted Carter's case work, prohibiting staff from providing her information for her to do a better job.

43. When Carter asked how she was to complete her work without adequate information, she was told to "figure it out."

44. Sometime between March 2016 and July 2016, Melesciuc told Carter not to speak to Intelligence Analyst Gomez.

45. Melesciuc told Carter not to investigate phone numbers that were not 808 area codes,[1] not to run Special Operations Division ("SOD") quick checks or FinCEN queries without getting his approval, contrary to DEA policy and not to mention "terrorism again," stating "[W]e don't do that here."

46. Melesciuc ridiculed Carter for not having recent experience with a recent DEA system.

47. Melesciuc told Carter to do reports on Word documents, not on the DEA Database Impact; DEA Database Impact would have tracked the date Carter sent the reports and the date he sent it back, so not using it allowed him to hold onto the reports.

_____

[1] "808" is the area code for Hawaii.

48. When Carter submitted reports, Melesciuc would sit on them for days, and repeatedly return them for correction in a hostile and condescending fashion.

49. Melesciuc berated Carter for at least an hour and a half, before she calmly and respectfully stated there was no reason for him to use his tone of voice and demeaning facial expressions to communicate with her; he became outraged, yelling, "what have you done in your career, do you know how to do anything, where are you from anyway-! I don't think I even have an employee profile on you, who have you worked for, I've never even heard of you."

50. On June 16, 2016, Carter finally received an email from Melesciuc scheduling her for a training in Chandler, Arizona, from September 12 to September 23, 2016.

51. On June 21, 2016, Carter was again told not to speak with other analysts, and Melesciuc scolded her for working with them.

52. Bonifant learned that Carter had been restricted from working with the High Intensity Drug Trafficking Area ("HIDTA") group.

53. Bonifant had numerous conversations about Carter's work, but his experience was that she gave more Intel support than his group had previously received.

54. Special Agent ("SA") William DiTuro stated that part of Carter's job was to provide research as an IA, but he recalled a case where Carter assisted him

and he was advised that if he wanted her help, he had to ask her supervisor. Melesciuc in fact told Carter not to share intelligence with the Agents as they had their own IA.

55. SA Gerald Lawson stated that the group was restricted from contacting Carter directly, and had to instead contact his own GS De Leo who would coordinate with Melesciuc, who could contact Carter; Lawson did not know why there was such a restriction, but believes it sounded like disparate treatment.

56. Program Analyst/Investigative Assistant Dianna Eng stated that Carter's case work had been restricted, and that she was advised Carter could not work on certain cases with her, because she was not up-to-date on the training, particularly with the new systems.

57. Robin Dinlocker told GS James DeLeo not to contact Carter.

58. Carter was the only person Melesciuc required to sign in and out each morning and afternoon, and she was told to check in from her DEA desktop to Melesciuc and Assistant Special Agent in Charge ("ASAC") Robin Dinlocker to report her presence at her desk, despite Dinlocker not being in her chain of command.

59. Carter was told she needed to check in because she arrived at different times in the morning, but there was no designated time, she was never spoken to

before about being late or what the office hours were, and she never received a work plan or any direction.

60. Melesciuc called DeLeo, DiTuro, and Lawson to find out where Carter was.

61. Melesciuc reported to management that Carter was made to check in because she asked for a special accommodation in hours, but she did not; rather, she told Melesciuc that she would rather work the same time as others because she did not want her integrity questioned.

62. Melesciuc told Carter that she would be required to report in "no matter what hours [she] chose", and later when changing to regular hours, she was required to check in anyway.

63. John Comer, Special Agent-in-Charge ("SAIC"), stated that nothing was brought to his attention relating to Carter falling behind on her duties or job responsibilities, or on her Veterans Affairs ("VA") appointments.

**Melesciuc's Disparaging Comments about Carter**

64. On January 14, 2016, Melesciuc called Carter into a meeting to discuss her "personal issues".

65. Melesciuc portrayed Carter as a "useless female, ridden with psychological problems."

66. On March 7, 2016, Carter overheard Melesciuc and Dinlocker laugh about her being "a senior GS-13 who doesn't know how to do anything", saying "this is what Headquarters sent us."

67. After overhearing this conversation, Carter emailed Melesciuc and Dinlocker referencing the conversation, and apologized for being a disappointment to them, stating that she would master the systems and every tool available to her.

68. On February 15, 2017, Melesciuc stated that Carter's VA appointments "did not impede the duties and responsibilities of Sharon Carter's position."

69. On February 17, 2017, Bonifant stated "I was privy to other discussions where her performance was criticized or chastised."

**Melesciuc Negative Remarks About Carter's Disability and Contacts Carter's Doctor**

70. Upon reporting for the GS-13 IA position in Hawaii in December, 2015, she told Melesciuc that she needed to leave for therapy when she started, and he asked her how long and how much.

71. Despite telling Melesciuc of her disability during a January 14, 2016, meeting, Melesciuc denied knowledge of Carter's disability.

72. On January 13 or 14, 2016, Melesciuc became angry, annoyed, red in the face, and used a condescending tone to ask "well how many times do you have to go to these 'meetings'" and "I will need to have advanced notice on my calendar to plan things" and "how much longer will this go on."

73. The next day, IA Naipo Robertson had a conversation with former secretary Tatiana, voicing his disgust for people who claim to have PTSD, commenting that it was "a bunch of BS."

74. Melesciuc referred to Carter's medical appointments as "another one of your VA appointments."

75. When referring to future tasks and assignments, Melesciuc would say "unless you have another VA appointment."

76. Regarding her VA appointments, Eng stated that Melesciuc "would come around to her desk and ask about Sharon Carter."

77. Bonifant reported that there were a number of times where Melesciuc commented on the number of days Carter was taking for her VA appointments.

78. Lawson stated that Melesciuc sent an email where he supposedly could not find Carter, and it seemed to be more harassment than a work problem.

79. In July 2016, Melesciuc contacted VA psychiatrist Dr. Helenna Nakama, to solicit information regarding a medical note she had faxed to Melesciuc.

80. Dr. Nakama's staff informed Carter of Melesciuc's contacts with them.

81. In July 2017, Carter applied for disability.

82. From July 19, 2016, to July 20, 2016, Carter was hospitalized for the second time because work conditions had worsened.

83. On July 20, 2016, Melesciuc had admitted he had contacted Carter's doctor without her permission.

84. By August 2016, David Stinnett, Field Intelligence Manager ("FIM"), was aware that Melesciuc contacted Dr. Nakama to inquire whether Carter was still hospitalized.

85. On August 2, 2016, Melesciuc had a call with Dr. Nakama, who would not disclose Carter's condition.

86. On August 2, 2016, Melesciuc admitted he contacted Carter's doctor.

87. On August 5, 2016, Melesciuc spoke with Dinlocker and Stinnett to determine Carter's work and leave status.

88. Carter sent a text message to Melesciuc inquiring why he contacted her doctor, and he did not respond.

89. On July 14, 2017, Carter applied for disability after exhausting all of her leave.

90. In August 2018, Carter was approved for disability.

91. The harassment was continuous from the day Plaintiff began in Hawaii until the day she ultimately had to leave her employment.

**Dinlocker Contacts Carter's Husband**

92. On December 23, 2015, Carter was so sick at work that Melesciuc to her not to come to work the next day because it would be a short day anyway since the following day would be a holiday.

93. On December 24, 2015, Melesciuc told Dinlocker that Carter had not reported to work or requested leave. This was only the second day after checking in.

94. On December 24, 2015, Carter's husband told Carter that Dinlocker had called him looking for her.

95. Carter called Melesciuc and reminded him that he had told her to stay at home that day.

96. Stinnett was aware that Carter's husband had been contacted.

**Melesciuc Treated Female Employees Differently Than Male Employees**

97. When two male analysts started, Melesciuc did not treat them the way he treated Carter.

98. On March 21, 2016, Carter arrived at work early after going to the gym, at approximately 7:00 AM.

99. Carter checked in and worked for approximately one hour before showering, then went to shower at the gym in the same building, being gone about 40 to 45 minutes.

100. When Carter returned to her desk, there was a note on her desk, computer, and phone to call Melesciuc; but before she could finish reading his emails, he called and demanded to know where she was.

101. Carter explained where she was and Melesciuc did not believe her; she pointed out that his rules applied only to her, and not to the males in the office.

102. Carter reminded Melesciuc of the long hours she worked and that she rarely took a lunch break.

103. On May 6, 2016, and from May 23 to May 27, 2016, IA Jorge Farias, a GS-13, and Robertson, a GS-11, filled in as Acting Supervisors, but Carter never did; despite the fact that Carter was a GS-13, step 7.

104. Eng stated Melesciuc's negative treatment of Carter could be gender-related because she had seen Melesciuc treat male employees better; for example, a male employee was not familiar with the system, but was treated fine.

105. DiTuro stated that Carter's problems with Melesciuc were because of gender, and that other women had direct reports of problems with Melesciuc.

106. IA Jackje Van Zanden was employed at the HDO from October 2011 to September 2015.

107. Melesciuc was Van Zanden's supervisor.

108. In April 2013, Melesciuc gave Van Zanden a bad evaluation, and when she inquired as to why he did not point out any of the issues prior to the evaluation, Melesciuc stated it was "not his job to do that"; he "never treated males that way."

109. On April 23, 2013, there were many instances of Melesciuc criticizing Van Zanden due to her alleged lack of training.

110. On October 16, 2014, during Van Zanden's close-out evaluation, Melesciuc tried to purposely take all of her cases away so he had no casework to evaluate her on, because he wanted to downgrade her evaluation when she moved to Ottawa, Canada.

111. When Van Zanden had to take off time for an illness, Melesciuc would say "Oh, you're not going to die; don't die on me; you're not going to die, right?"

112. On December 18, 2014, Field Intelligence Manager ("FIM") Kathy Arboleda spoke to Van Zanden at length about the situation at the Honolulu District Office, and stated "with no prompting whatsoever", that "You are working in a hostile environment."

113. Meredith Hersh, Intelligence Analyst, recalled an instance where Melesciuc denied Hersh leave while she was in training status.

114. Hersh stated that "if I emailed [Melesciuc] to tell him I put in a leave slip he would email me back and be just verbally abusive, that it wasn't acceptable

and I needed to do an email and I needed to say everything about that day of leave."

115. Hersh also stated that Melesciuc "would try to find any opening that he could attack", that "there was never an occasion where I extended interaction with him that I was not attacked in his response", that she "never saw him treat any male that way ever in the time that he and I were both in the office. I never saw that", and that "two men came into the office and never ever did he put the same restrictions on them."

116. Hersh spoke to Arboleda in order to go on record that she was experiencing gender discrimination from Melesciuc.

117. In 2015, Hersh transferred to El Paso, Texas, because of Melesciuc's treatment of her.

118. When Investigative Analyst Mayda Jones was assigned to the Hawaii office, Melesciuc restricted her caseload, reassigning much of her work to younger female staff, until eventually she had nothing to do.

119. Melesciuc told Jones that she had "very serious gender issues."

120. Jones stated that Melesciuc "was very different with the male staff", that "the men never got chastised the way I did, the men never got talked about", that "the men were never restricted from doing their job", and that "the men were never told they had serious gender issues."

## Carter Complains to Management About a Toxic Work Environment

121. In February 2016, Carter spoke with Melesciuc about his mimicking her, and brought it up with Stinnett during a phone call.

122. Carter complained to Bonifant, DeLeo, DEA Acting Supervisor and EEO representative Kelsey Strapple-Bru, Eng, Lawson, DiTuro, and three male analysts about the hostile work environment.

123. Carter sought the Employee Assistance Program ("EAP").

124. On March 25, 2016, Carter reported Melesciuc to Stinnett, who stated that he was already briefed on her "issues" despite her never having met him.

125. Stinnett arranged a telephone conference between himself, Carter, and Melesciuc for 10:00 AM on March 28, 2016.

126. During the March 28, 2016 conference call, Stinnett glossed over Carter's complaints, then stated "good we've worked all of this out."

127. On March 31, 2016, after meeting with Melesciuc and Stinnett, Melesciuc sent Carter an email noting that she had not been checking in and out.

128. Carter sent an email to Melesciuc and Stinnett reporting the need to check in and out was harassment and retaliation, and asserting that she would not check in and out unless all other employees did.

129. Stinnett emailed Melesciuc directing him to keep Dinlocker in the loop, and noting that he was bringing Division Counsel Julie Hamilton into the loop.

130. Stinnett also noted that he spoke to Associate Special Agent in Charge, "Associate SAC," David Downing about Carter, and that he wanted "all to come together to plan a path forward that works for all concerned."

131. On April 1, 2016, Carter emailed Stinnett regarding a toxic environment, documenting her account of the March 28, 2016 telephone conference, recounting Melesciuc's abuse, and reporting that he was now angry.

132. On April 4, 2016, Carter again complained to Stinnett, reporting Melesciuc's retaliation.

133. Stinnett forwarded the April 4, 2016, email to Melesciuc and Dinlocker.

134. On April 4, 2016, Stinnett noted the "need to get Sharon Carter a work plan."

135. On April 14, 2015, after her fifth complaint, Carter was called into a conference room, where she was attacked regarding her Mid-Year Evaluation.

136. Stinnett made Carter sign her Mid-Year Evaluation prior to reading it, and Melesciuc took it back, saying he needed to make a correction.

137. Melesciuc and Stinnett continued to reference Carter's "issues", without defining them.  In fact, at the meeting Carter clarified that Melesciuc was my only issue she had trouble with.

138. Carter objected to Melesciuc's concern for her and cited examples, continuing to insist it was discrimination to require only her to check in.

139. In March 2016 during the phone conference and again on April 14, 2016, Melesciuc and Stinnett stressed Carter's lack of knowledge, stated she needed training that they had allegedly set up for her, and hammered her for working longer hours than required, emphasizing her "issues."

140. The meeting lasted two and a half hours, before they were ushered into Dinlocker's office, during which a group of Agents waiting outside of the conference room saw Carter crying and visibly upset.

141. On April 14, 2016, Carter was presented with her Mid-Year Evaluation, and Stinnett and Melesciuc made her sign it before reading it.

142. After April 22, 2016, when Carter returned to work from the hospital; she was reprimanded, co-workers were mean to her; and Robertson, Gomez, and Farias would not speak with her.

143. On April 22, 2016, Carter received a memorandum from Stinnett dated April 19, 2016, regarding the Mid-Year Progress Review that was supposedly discussed in the April 14, 2016 meeting, and discussed her "issues."

144. From May 1, 2016, to June 30, 2016, several emails were exchanged between Carter and Stinnett, with Carter requesting to meet; however, when Carter

informed Stinnett that she decided not to meet Stinnett any longer, Stinnett

nonetheless insisted that they have the meeting anyway.

145. After making her fifth complaint to Stinnett regarding Melesciuc,

stating that "the situation in our office has not improved at all, that complaint

triggered a series of hostile email responses during May and June of 2016.

### **Management Attempts to Respond to Carter's Complaints**

146. On June 23, 2016, Stinnett told Melesciuc to check with Human

Resources Specialist ("HRS") Deborah Arbitman.

147. On June 23, 2016, Melesciuc discussed Arbitman editing his

Memorandum of Warning to Carter.

148. On June 27, 2016, Stinnett sent an email to Arbitman, with copies to

Hamilton, Melesciuc, and Downing, seeking guidance on how to proceed, stating

that management's desire was to issue her a the letter of Warning, rather than to

deal with any of Carter's concerns and that he was "willing to direct her in stronger

terms if need be."

149. On June 27, 2016, Downing emailed Stinnett, asking him to "let me

know her response."

150. On July 11, 2016, emails were exchanged between Melesciuc, Stinnett,

and Downing regarding the Memorandum of Warning.

151. On July 13, 2016, in a Formal Supervisory Referral to the EAP, Melesciuc stated that Carter's personal and medical problems had serious consequences on her job performance.

152. In the Formal Supervisory Referral to the EAP, Melesciuc wrote that "during your Mid-Year Perf Eval (04/14/2016), documented several performance issues and deficiencies which have yet to be achieved"; but Carter still had not received training from her supervisors, and it was not scheduled until the following September.

153. Dinlocker contended she was not aware of Carter's disability.

154. Dinlocker claimed Carter never complained to her that Melesciuc was restricting her case work; but Carter was not in Dinlocker's chain of command.

155. Stinnett and Melesciuc did not report Carter's complaints of a hostile work environment to the Department of Justice's Office of Professional Responsibility ("OPR"), as required by DEA policies.

## COUNT I
## DISABILITY DISCRIMINATION IN VIOLATION
## OF TITLE VII

156. Plaintiff re-alleges and reincorporates all prior allegations as if fully stated herein.

157. Plaintiff is a female.

158. The Agency discriminated against Plaintiff based on gender when it took each of the following actions: (a) restricted her assignments; (b) contacted her doctor without her authority; (c) contacted her husband without her authority; (d) singled her out for clocking in and out with respect to her work attendance; (e) ridiculed her; (f) refused to assist her in her job duties; (g) reduced her 2016 mid-year evaluation and wrote poor comments on same; (h) did not make her acting supervisor; (i) failed to provide proper training for her job; (j) got angry with her for requesting leave; (k) withheld mail from her; and (l) being overly critical to the point of hostility regarding her work.

159. Plaintiff's gender was a motivating factor for the agency's treatment of her regarding the aforesaid actions.

160. None of the similarly situated employees or Plaintiff's co-workers were treated in the same manner.

161. Other female employees had some of the same actions taken against them by the same management team.

162. Each of the aforementioned adverse action affected the tangible aspects, ie, the terms and conditions of Plaintiff's employment.

163. The Agency acted wantonly, willfully, with malice, and with reckless indifference to Plaintiff's civil rights.

164. Because of this unlawful conduct, Plaintiff suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, loss of self-esteem, and other personal damages.

## COUNT II
## DISABILITY DISCRIMINATION IN VIOLATION
## OF THE REHABILITATION ACT

165. Plaintiff re-alleges and reincorporates all prior allegations as if fully stated herein.

166. Plaintiff suffered the aforementioned tangible, adverse employment actions consisting of the following actions: (a) restricted her assignments; (b) contacted her doctor without her authority; (c) contacted her husband without her authority; (d) singled her out for clocking in and out with respect to her work attendance; (e) ridiculed her; (f) refused to assist her in her job duties; (g) reduced her 2016 mid-year evaluation and wrote poor comments on same; (h) did not make her acting supervisor; (i) failed to provide proper training for her job; (j) got angry with her for requesting leave; (k) withheld mail from her; and (l) being overly critical to the point of hostility regarding her work.

167. Plaintiff suffered these actions because of her disability.

168. Employees similarly situated to Plaintiff, who did not have Plaintiff's disability, did not have these tangible, adverse employment actions taken against them.

169. The Agency acted wantonly, willfully, with malice, and with reckless indifference to Plaintiff's civil rights.

170. Because of this unlawful conduct, Plaintiff suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, loss of self-esteem, and other personal damages.

## COUNT III
## TITLE VII HOSTILE WORK ENVIRONMENT
## BASED ON GENDER

171. Plaintiff incorporates by reference all preceding paragraphs herein.

172. Plaintiff was subjected to a severe and pervasive hostile work environment from December 2015 to October 2016 due to her gender.

173. The environment was both objectively and subjectively hostile towards Plaintiff.

174. Similarly situated male employees were not subject to the hostile work environment.

175.  In addition to the aforementioned actions, management portrayed Plaintiff as a "useless female, ridden with psychological problems," assigned her secondary case work while males were assigned primary case work, and chose lower-ranked males to serve as Acting Supervisor.

176. In addition, management instructed co-workers not to speak with or assist her in any way; and totally isolated her.

177. This conduct was clearly related to Plaintiff's gender, as several female employees reported that unlike the female employees, male employees did not suffer Management's verbal abuse, chastisement, restrictions on their jobs, negative comments about their experience and qualifications, and social exclusion.

178. This conduct constitutes gender-based harassment in violation of Title VII.

179. Gender discrimination is made unlawful by the Title VII's prohibition on gender discrimination.

180. This conduct had the effect of interfering with Plaintiff's work in the workplace.

181. Plaintiff made multiple complaints to Management and a DEA Counselor, making it clear that the above-referenced actions constituted harassment, and that she was opposed to such harassment.

182. The actions of Robert Melesciuc and others towards Plaintiff, and Management's failure to remedy the hostile environment, allowed Management and Plaintiff's co-workers to continue a hostile environment which materially altered Plaintiff's working conditions and which constitutes harassment.

183. Plaintiff suffered financial and emotional harm as a direct, foreseeable, and proximate result of Defendants' unlawful actions, emotional distress, humiliation, shame, and embarrassment.

184. Defendant made conditions so detestable for Plaintiff that Plaintiff's medical conditions worsened, thereby forcing her to apply for disability, which she received.

## COUNT III
## HOSTILE WORK ENVIRONMENT
## BASED ON DISABILITY

185. Plaintiff incorporates by reference all preceding paragraphs herein.

186. Plaintiff was subjected to a severe and pervasive hostile work environment from December 2015 to October 2016 due to her disability.

187. The environment was both objectively and subjectively hostile towards Plaintiff.

188. Similarly situated non-disabled employees were not subject to the hostile work environment.

189. In addition to the aforementioned actions, management portrayed Plaintiff as a "useless female, ridden with psychological problems,"assigned her secondary case work while non-disabled employees were assigned primary case work, and chose lower-ranked non-disabled employees to serve as Acting Supervisor.

190. This conduct was clearly related to Plaintiff's disability as non-disabled employees did not suffer Management's verbal abuse, chastisement, restrictions on

their jobs, negative comments about their experience and qualifications, and social exclusion.

191. This conduct constitutes a hostile work environment based on the Rehabilitation Act.

192. This conduct had the effect of interfering with Plaintiff's work in the workplace.

193. Plaintiff made multiple complaints to Management and a DEA Counselor, making it clear that the above-referenced actions constituted harassment, and that she was opposed to such harassment.

194. The actions of Robert Melesciuc and others towards Plaintiff, and Management's failure to remedy the hostile environment, allowed Management and Plaintiff's co-workers to continue a hostile environment which materially altered Plaintiff's working conditions and which constitutes harassment.

195. Plaintiff suffered financial and emotional harm as a direct, foreseeable, and proximate result of Defendants' unlawful actions, emotional distress, humiliation, shame, and embarrassment.

196. Defendant made conditions so detestable for Plaintiff that Plaintiff's medical conditions worsened, thereby forcing her to apply for disability, which she received.

## COUNT IV
## RETALIATION

197. Plaintiff re-alleges and reincorporates all prior allegations as if fully stated herein.

198. Plaintiff engaged in protected EEO activity by complaining to Management about a hostile work environment at least as early as April 4, 2016.

199. On March 24, 2016, Plaintiff complained about her hostile work environment to HR Specialist, Martina Johnson, from the Agency's Human Resources office.

200. On April 1, 2016, Ms. Johnson responded to Plaintiff's email and voice mail messages and sent an email to her on that day.

201. Said email stated that Ms. Carter had three options to address her situation:

> a.  You may share your concerns with the next level in your chain-of-command for their review and consideration.  From your voice mail message, I am not sure if you attempted this option and feel that the results were not productive;
>
> b.   You may file a grievance, in writing, to the next level in your chain-of-command that was not involved in this matter. The grievance procedure is located on Webster, under Human Resources policies.  The grievance procedure is DEA Policy Manual 2771; and
>
> c.   If you believe that you are a victim of discrimination due to race, color, sex (including sexual harassment),  religion, national origin, disability (physical or mental), reprisal, gender identity, genetic information, sexual orientation (DOJ policy) or parental status

(DOJ policy), you may file an Equal Employment Opportunity (EEO) complaint with the DEA EEO Office.  The DEA EEO Office may be contacted at 202/307-8888 or fax 202/307-8942. (Exhibit 1).

202. At no time did Ms. Johnson inform Ms. Carter that she had a 45 day deadline to commence her action with the DEA's EEO office.

203. Rather than immediately complain to the EEO office right away, Ms. Carter attempted to work out her concerns with management, one of the very options the agency told her to do.

204. Had Ms. Johnson informed Ms. Carter that Ms. Carter's attempt to first work out the issues with her management would not have stopped the EEO 45 day deadline, she would have filed with the EEO office in March of 2016.

205. In April 2016, following the complaint, Management gave Plaintiff a poor Mid-Year Evaluation.

206. Management asked Plaintiff to check in and out of work, a requirement only placed on her.

207. In July 2016, when Plaintiff returned from a hospital stay, she was reprimanded, co-workers were meaner to her, and several co-workers would not speak to her.

208. In July 2016, Management prepared a Memorandum of Warning to be issued against Plaintiff.

209. Management stated that Plaintiff's personal and medical problems had serious consequences on her job performance.

210. Management failed to report Plaintiff's complaints of a hostile work environment to OPR, despite Agency policy.

211. Management—Defendant's employees—retaliated against her because she made complaints regarding discrimination and/or the hostile work environment.

212. Management was motivated by a retaliatory animus stemming from Plaintiff's aforementioned complaints.

213. Because of Plaintiff's complaints about discrimination, management took the following actions: (a) issued her a reduced 2016 Mid-Year evaluation; (b) contacted her doctor without her permission; (c) contacted her husband without her permission; (d) instructed co-workers not to speak with or assist her in any way; and (e) totally isolating her.

214. The change in the requirements for "checking in and out", and the issuance of a Memorandum of Warning, were done to reasonably dissuade Plaintiff from complaining about discrimination and/or asking for accommodation.

215. This was a violation of the Rehabilitation Act and of Title VII's prohibition on retaliation.

216. The Agency, through its employees, Robert Melesciuc, David Stinnett, Robin Dinlocker, and others, acted wantonly, willfully, with malice, and with reckless indifference to Plaintiff's civil rights.

217. Because of this unlawful conduct, Plaintiff suffered monetary damages and additionally suffered anguish, anxiety, fear, helplessness, shock, humiliation, insult, embarrassment, loss of self-esteem, and other personal damages.

218. Defendant made conditions so detestable for Plaintiff that Plaintiff's medical conditions worsened, thereby forcing her to apply for disability, which she received.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

    a. A declaratory judgment that the conduct of the Agency challenged herein was illegal and in violation of the aforementioned laws;

    b. Economic and Compensatory damages in an amount to be proved at trial, including compensation for past and future pecuniary and non-pecuniary losses resulting from the unlawful employment practices described herein;

    c. Reasonable attorneys' fees, expenses, and costs incurred by Plaintiff; and

d.  Such other and further relief as the Court may deem just.


DATED:  Honolulu, Hawaii, February 13, 2019.


/s/ David R. Squeri
DAVID R. SQUERI

Attorney for Plaintiff
SHARON CARTER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SHARON CARTER, | Civil No. |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| v. | |
| UTTAM DHILLON, Acting Administrator, United States Drug Enforcement Administration U.S. Department of Justice, | |
| Defendant. | |

## DEMAND FOR JURY TRIAL

Plaintiff SHARON CARTER, by and through her undersigned attorneys at the Greater Pacific Law Office, LLLC, hereby requests a trial by jury on all matters triable.

DATED:  Honolulu, Hawaii, February 13, 2019.

/s/ David R. Squeri
DAVID R. SQUERI

Attorney for Plaintiff
SHARON CARTER